UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| CHRISTOPHER BROWN, *Plaintiff*, | : : : : | |
| v. | : : | No. 3:22-cv-1453 (VAB) |
| WARDEN BARONE, et al., *Defendants*. | : : : : | |

**INITIAL REVIEW ORDER**

Christopher Brown ("Plaintiff"), currently confined at Cheshire Correctional Institution in Cheshire, Connecticut, has filed a Complaint *pro se* under 42 U.S.C. § 1983. Compl., ECF No. 1.

Mr. Brown names three Defendants, Warden Barone, Deputy Warden Snyder, and Unit Manager Bishop. Defendants are named in their individual capacities only. Mr. Brown seeks damages and declaratory relief.

For the reasons discussed below, Mr. Brown's claims based on Defendants' failure to separate Mr. Brown and Mr. Rhodes shall proceed. Mr. Brown's general claims based on Defendants' failure to place him in a single cell are **DISMISSED with prejudice**.

**I.    FACTUAL BACKGROUND**

Mr. Brown alleges that he has been classified by the Department of Correction as a seriously mentally ill inmate. Compl. ¶ 8. He has allegedly been diagnosed with several mental health disorders including post-traumatic stress disorder, borderline personality disorder, and antisocial personality disorder. *Id.* ¶ 9. He also allegedly experiences night terrors when he sleeps. *Id.* Mr. Brown attributes his mental illness to the fact that he was held in solitary

confinement for nearly half of the eighteen years he has been incarcerated. *Id.* ¶ 22. He alleges that he currently is prescribed psychotropic medication for post-traumatic stress disorder, night terrors, and hallucinations. *Id.*

On March 8, 2020, Mr. Brown allegedly shared a cell with a Latin Kings gang member who stole his personal property when Mr. Brown was sent to segregation. *Id.* ¶ 11. When Mr. Brown returned to the cell, he and the inmate allegedly fought over the property. *Id.* ¶ 12. While being taken to segregation after the fight, Mr. Brown allegedly stated on camera that he would "kill and severely disfigure" any inmate placed in his cell from that time forward. *Id.* Mr. Brown alleges that he was issued a disciplinary report for threats after making this statement. *Id.*

Mr. Brown was then allegedly transferred to MacDougall-Walker Correctional Institution, where he was housed in a single cell. *Id.* ¶ 14. Mr. Brown alleges that Defendants "by law w[ere] forced to maintain the plaintiff in a cell by himself for the safety of all the other prisoners along with the plaintiff." *Id.*

On August 17, 2020, Defendants allegedly attempted to place another inmate in Mr. Brown's cell. *Id.* ¶ 15. According to the Complaint, when Mr. Brown informed them of his intention to harm the inmate, he was issued another disciplinary charge for threats and taken to segregation. *Id.* Mr. Brown was allegedly placed in a single cell in the segregation unit. *Id.* ¶ 17. Lieutenant Bard told allegedly Mr. Brown that, that morning, Deputy Warden Snyder had withdrawn Mr. Brown's single cell status. *Id.* ¶ 18.

Each Defendant allegedly knew that Mr. Brown was refusing his medication for weeks before the incident underlying this action. *Id.* ¶ 25. He alleges that Defendants "chose to ignore the warning signs of danger the plaintiff was displaying" and "elected to still try and place prisoners in the cell with me knowing full well what the plaintiff was incarcerated for, the

statements he was making, his mental deterioration at the time, and what his intentions were." *Id.* ¶ 27.

Several days before September 23, 2020, Defendants allegedly placed inmate Shaquin Rhodes in Mr. Brown's cell. *Id.* ¶ 28. Mr. Brown believes that Defendants thought that, because Mr. Rhodes was "a huge and big brawly black man," Mr. Brown would be intimidated and comply with the order to share a cell. *Id.* According to Mr. Brown, however, Mr. Rhodes was the brother of a man Mr. Brown had shot before he was incarcerated. *Id.* ¶ 29. Mr. Brown allegedly informed each Defendant of this fact. *Id.*

The first night Mr. Rhodes was in the cell, Mr. Brown alleges that he and Mr. Rhodes "sat up all night from fear of each other and us recognizing one another and that one of us would do something to the other." *Id.* ¶ 30. That night, Mr. Rhodes allegedly wrote an inmate request to all three Defendants explaining the situation and expressing his fear of being in the same call as the man who had shot his brother. *Id.* Mr. Rhodes's mother and other family members allegedly called the facility that night and the next day to express their concerns. *Id.*

Defendants allegedly did not separate the inmates. *Id.* ¶ 31. According to Mr. Brown, neither he nor Mr. Rhodes slept for the next couple of night. *Id.* Mr. Rhodes allegedly learned about Mr. Brown's mental health issues and prior statement to harm anyone put in his cell. *Id.* Mr. Rhodes then allegedly asked each Defendant to move him before something happened, but they allegedly told him to deal with the situation and "that if he did shoot your brother, then you yourself should take care of that problem." *Id.* ¶ 32.

Mr. Brown alleges that, after learning what Defendants told Mr. Rhodes, Mr. Brown believed that Mr. Rhodes would attack him. *Id.* ¶ 34. At about 10:00 p.m. on September 23, 2020, Mr. Brown allegedly saw Mr. Rhodes get up, put on his sneakers, and start pacing back

and forth and looking out the cell door window. *Id.* Mr. Brown allegedly believed that Mr. Rhodes was "almost covertly watching out for the C/O." *Id.* Mr. Brown alleges that Mr. Rhodes saw a correctional officer and whispered to him through the crack in the door. *Id.* ¶ 38. Mr. Brown allegedly has attached to his Complaint a copy of the disciplinary report in which a correctional officer states that Mr. Rhodes asked to speak with a supervisor because he was not getting along with Mr. Brown and wanted to be moved. *Id.* at 27.

At this point, Mr. Brown allegedly got up and put Mr. Rhodes in a choke hold, immobilizing him. *Id.* ¶ 35. During the "struggle and tussle" both inmates allegedly sustained head injuries. *Id.* Mr. Rhodes allegedly fell backwards on top of Mr. Brown causing Mr. Brown to hit his head on a metal desk. *Id.* ¶ 36. As a result of the alleged injury, Mr. Brown allegedly suffers migraine headaches and blackouts. *Id.*

"Because of the circumstances surrounding the whole situation," the medical department allegedly refused to see Mr. Brown or provide medical attention. *Id.* ¶ 37. Eventually, he allegedly received treatment at Garner Correctional Institution. *Id.*

Mr. Rhodes allegedly pressed charges against Mr. Brown. *Id.* ¶ 44. The charges were allegedly nolled, however, based on the evidence that both Mr. Rhodes and Mr. Brown tried to separate themselves by informing Defendants of the conflict between them. *Id.* ¶ 45.

## II.     STANDARD OF REVIEW

Under Section 1915A of title 28 of the United States Code, the court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments

[they] suggest[]." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). This requirement applies both when the plaintiff pays the filing fee and when he proceeds *in forma pauperis*. *See Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam).

Although detailed allegations are not required, the Complaint must include sufficient facts to afford Defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, notwithstanding this liberal interpretation, a *pro se* complaint will not survive dismissal unless the factual allegations meet the plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 387 (2d Cir. 2015).

**III.   DISCUSSION**

Mr. Brown alleges that Defendants caused him to be confined in unsafe living conditions and failed to protect him from himself. He seeks to

> hold defendants accountable for knowing the dangers that the plaintiff presented to himself and others. Knowing he was a mentally ill prisoner who[] wasn't on his medications for weeks. For knowing full well of his charges and declarations of death, disfiguration and harm to any other prisoners if placed in his cell and which led to the injuries the plaintiff and [Mr. Rhodes] suffered.

*Id.* ¶ 48.

5

All three Defendants are supervisory officials. The Second Circuit has clarified the standard to be applied to a claim for supervisory liability. *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). In *Iqbal*, the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a lesser showing of culpability than the constitutional violation requires." *Tangreti*, 983 F.3d at 617 (citing *Iqbal*, 556 U.S. at 677). In *Tangreti*, the Second Circuit held that, "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).

The Second Circuit noted that, while "'[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," "[t]he violation must be established against the supervisory official directly." *Id.* (second alteration in original). Mr. Brown asserts claims under the Eighth Amendment and therefore must allege facts sufficient to show that the actions of the supervisory officials violated the Eighth Amendment directly.

"[T]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to [his] current or future health, and (b) that the defendant acted with deliberate indifference." *Id.* at 618–19 (internal quotation marks omitted). In order to show that the supervisory officials acted with "deliberate indifference," Mr. Brown must show that they "personally knew of and disregarded an excessive risk to [Mr. Brown's] health or safety." *Id.* at 619.

Before addressing the actions of each Defendant, the Court considers whether Mr. Brown has alleged facts showing that he was subjected to conditions of confinement that posed an unreasonable risk of harm to him. Mr. Brown allegedly was injured as a result of his decision to attack Mr. Rhodes. He alleges that he began refusing a cellmate after he fought with his cellmate over theft of personal property, not because sharing a cell exacerbated his mental health issues. Thus, Mr. Brown alleges no facts suggesting that, as a general matter, sharing a cell posed an unreasonable risk of harm to him.

Mr. Brown claims that Defendants were constitutionally required to ensure that he did not harm another inmate and to house him in a single cell to do so. Mr. Brown is mistaken. Absent a serious risk of harm to him, Mr. Brown "does not otherwise have a general constitutional right to be housed in a single cell or to have single-cell status." *Alejandro v. Quiros*, No. 3:21-cv-0542 (JAM), 2021 WL 5324905, at *4 (D. Conn. Nov. 16, 2021); *Germano v. Cook*, No. 3:19-cv-01204 (JAM), 2020 WL 264763, at *11 (D. Conn. Jan. 17, 2020) (collecting cases). Indeed, to hold otherwise would enable every Connecticut inmate to obtain a single cell by making similar threats.

There are no reported cases in the Second Circuit considering this scenario. A district court in the Western District of Pennsylvania, however, has addressed and rejected a similar claim. *See Myer v. Giroux*, No. CV 15-71, 2018 WL 6831147 (W.D. Pa. Dec. 28, 2018). In *Myer*, the plaintiff challenges the decision of prison officials to remove his single cell status arguing that the status was warranted because of his prior assaultive behavior. *Id.* at *3. The court rejected the claim:

> There is no evidence in the record to suggest that Plaintiff was ever threatened with physical harm or assaulted. Instead, he asserts that prison officials should have known that *he would assault someone else* based on his own history of violence and aggression. However,

7

> Plaintiff cannot establish a failure to protect claim based on prison officials' failure to protect other inmates from himself. To the extent that Plaintiff implies that his own violent background might have provoked another inmate to respond with violence, either preemptively or reactively, he has not provided any evidentiary support for this supposition. As such, his attempt to demonstrate a substantial risk of harm based on nothing more than his own general propensity toward violence represents the type of speculative entreaty that the Third Circuit and other courts have routinely deemed inadequate to support an Eighth Amendment claim.

*Id.* at *8.

The facts in Myer are similar to the facts here. Mr. Brown was required to share a cell after his single cell status was discontinued. Mr. Brown had threatened to harm any future cellmate and repeatedly referred to his criminal charge to show his violent propensity.[1] The Court is persuaded by the reasoning in *Myer* and concludes that Mr. Brown cannot state a plausible failure to protect claim based on Defendant's failure to house him in a single cell.

Mr. Brown has, however, plausibly alleged that the failure to separate him and Mr. Rhodes posed an unreasonable risk of serious harm to his health. The Eighth Amendment's unreasonable risk of harm requirement may be satisfied "where there is prior hostility between inmates, or a prior assault by one inmate on another, and those inmates are not kept out of contact from one another." *George v. Burton*, No. 00 Civ. 143 (NRB), 2001 WL 12010, at *3 (S.D.N.Y. Jan. 4, 2001); *see also Bass v. Jackson,* 790 F.2d 260, 261 (2d Cir. 1986) (allegations that prison officials failed to separate inmates whom they knew had a growing feud was sufficient to state a claim for deliberate indifference to a risk of physical harm when a prisoner was injured in subsequent violence).

---

[1] The Department of Correction website shows that Mr. Brown was convicted of murder.  *See* www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=284612.

According to the Complaint, Mr. Brown shot Mr. Rhodes's brother before he was incarcerated. Compl. ¶ 29. Mr. Brown alleges that both he and Mr. Rhodes viewed each other as a threat and stayed up for several nights in a row out of fear that each would be attacked by the other in his sleep. *Id.* ¶¶ 30–31. Although Mr. Brown initiated the fight in which he was injured, the Court can reasonably infer that he did so because he feared Mr. Rhodes "would ultimately attack him" "later that night." *Id.* ¶¶ 34–35. Mr. Brown alleges that Mr. Rhodes put his sneakers on around 10:00 p.m. after recreation was over for the day and that Mr. Rhodes was pacing back and forth "almost covertly watching out" for the correctional officer. *Id.* ¶¶ 34, 38. Based on these allegations, Mr. Brown could have reasonably believed that Mr. Rhodes posed an imminent threat to his safety. Thus, the injuries Mr. Brown suffered after he assaulted Mr. Rhodes plausibly could have been caused by Defendants' failure to separate Mr. Brown and Mr. Rhodes.

Mr. Brown has also alleged that each Defendant was deliberately indifferent to the risk of failing to separate him from Mr. Rhodes. He alleges that both he and Mr. Rhodes informed each Defendant of the situation between them before the incident occurred.[2] *Id.* ¶¶ 29, 32. Mr. Brown also alleges that Mr. Rhodes's family called prison officials numerous times to express their concerns. *Id.* ¶ 30. Accepting these allegations as true, Defendants were aware of the history between Mr. Brown and Mr. Rhodes and the threat they posed to each other, but they nonetheless failed to act. Thus, Mr. Brown has plausibly alleged that Defendants were deliberately indifferent to the risk of serious harm. *See Walker v. Shaw*, No. 08 Civ. 10043 (CM), 2010 WL 2541711, at *11 (S.D.N.Y. June 23, 2010) (allegations of failure to relocate an inmate

---

[2] Although Mr. Brown does not allege how either he or Mr. Rhodes contacted these supervisory officials, the allegations in the Complaint "are enough to raise questions of fact as to what the correctional officers knew and when they knew it." *Bass*, 790 F.2d at 263.

despite known threats to his safety were sufficient to state a claim for deliberate indifference even when there was no prior violence).

Accordingly, the Court will permit Mr. Brown's claim based on Defendants' failure to separate him from Mr. Rhodes to proceed.

**ORDERS**

For the foregoing reasons, the court enters the following orders:

(1) The case shall proceed on Mr. Brown's individual capacity claims for damages and declaratory relief based on Defendants' failure to separate Mr. Brown and Mr. Rhodes after being informed of the risk of violence between them. Mr. Brown's general claims based on Defendants' failure to place him in a single cell are dismissed with prejudice.

(2) The Clerk of Court shall verify the current work addresses for Warden Barone, Deputy Warden Snyder, and Unit Manager Bishop with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and attachments to them at their confirmed addresses by **January 20, 2023**, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If any Defendant fails to return the waiver request, the Clerk of Court shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that Defendant, and that Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The Clerk of Court shall send a courtesy copy of the Complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(4) Defendants shall file their response to the Complaint, either an Answer or motion to dismiss, by **March 24, 2023**. If a Defendant chooses to file an Answer, the

Defendant shall admit or deny the allegations and respond to the cognizable claims recited above. The Defendant may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, according to Federal Rules of Civil Procedure 26–37, shall be completed by **July 28, 2023**. Discovery requests need not be filed with the court.

(6) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(7) All motions for summary judgment shall be filed by **September 8, 2023**.

(8) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If Mr. Brown changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Mr. Brown must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Mr. Brown has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify Defendants or defense counsel of his new address.

(10) Mr. Brown shall utilize the Prisoner Efiling Program when filing documents with the court. Mr. Brown is advised that the Program may be used only to file documents with the court.

Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on Defendants' counsel by regular mail.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of December, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE